IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

FILED
JUL - 8 2013
Clerk, U.S. District Court
By:_____ Deputy Clerk

| | |
|---|---|
| **UNITED STATES OF AMERICA,** )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>**OBINNA ACHONU,** )<br>)<br>Defendant. )<br>_____ ) | Case No. 13-MJ-8148-01-JPO |

## CRIMINAL COMPLAINT

I, Special Agent Melissa S. Morrow, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief.

Count 1

Beginning in or about June 2006, the exact date being unknown, and continuing to on or about July 8, 2013, in the District of Kansas and elsewhere, the defendant,

OBINNA ACHONU,

knowingly and intentionally conspired and agreed together with other persons known and unknown to the affiant, to commit the following offense against the United States: interstate transportation of stolen property, by transporting, transmitting, and transferring goods in interstate commerce from the State of Kansas to the States of Maryland and New Jersey, which were computer equipment and Cisco switches stolen from Sprint with a value exceeding $5,000, knowing the goods had been stolen, in violation of Title 18, United States Code, Sections 2314 and 2.

**Manner and Means**

It was part of the conspiracy that an employee with Sprint in Overland Park, Kansas, stole computer equipment and Cisco switches from various Sprint locations in Kansas.

It was further part of the conspiracy that the Sprint employee began selling the stolen computer equipment and Cisco switches to a co-conspirator based in Maryland, where most of the stolen goods were sent.

It was further part of the conspiracy that the Maryland co-conspirator began using co-conspirator Chukwudi John Chukwumah to distribute stolen computer equipment and eventually arranged for conspirator Chukwumah to serve as the intermediary between the Sprint employee and the Maryland co-conspirator.

It was further part of the conspiracy that the Maryland conspirator began using the defendant to facilitate the distribution of stolen computer equipment and arranged for the defendant to serve as the intermediary between the Sprint employee and the Maryland conspirator.

It was further part of the conspiracy that the defendant and conspirator Chukwumah wire transferred funds or delivered cash or cashier's checks to the Sprint employee for the purported stolen computer equipment and Cisco switches.

**Overt Acts**

In furtherance of this conspiracy and to effect and accomplish the objects of it, one or more of the defendants or conspirators, both charged and uncharged, committed, among others, the following overt acts in the District of Kansas and

elsewhere:

- From in or about July 2007 through in or about July 2011, the Sprint employee provided enough stolen equipment to the Maryland conspirator to have received more than $2 million from the Maryland conspirator.

- From in or about November 2009 through in or about July 2011, the Sprint employee and Maryland conspirator communicated via e-mail hundreds of times with many discussions regarding the prices, shipments, and methods of payment for the stolen equipment.

- On or about March 14, 2013, the Maryland conspirator introduced conspirator Chukwumah to the Sprint employee, so Chukwumah could serve as an intermediary receiving the stolen equipment in Virginia and paying the Sprint employee for the stolen equipment.

- On or about March 19, 2013, Chukwumah wire transferred funds from Virginia to the Sprint employee in Kansas, to entice the delivery of stolen equipment.

- On or about May 31, 2013, Chukwumah agreed to wire transfer $15,000 to the Sprint employee and bring $30,000 cash with him to Kansas City to purchase stolen computer equipment.

- On or about June 11, 2013, Chukwumah made airline reservations to fly to Kansas City from Virginia to meet the Sprint employee, take possession of purported stolen computer equipment valued in excess of $5,000, and deliver the purported stolen goods to a private interstate carrier for its intended shipment to Virginia from Kansas.

- On or about June 14, 2013, Chukwumah traveled to Kansas City and met the Sprint employee, where he took possession of the purported stolen computer equipment, and prepared it for shipment to New Jersey at a UPS store in Kansas City, Kansas.
- On or about June 14, 2013, Chukwumah had in his possession three cashier's checks totaling $20,000 to pay the Sprint employee for the purported stolen computer equipment.
- On or about June 18, 2013, the Maryland conspirator introduced the Sprint employee to the defendant.
- On or about June 25, 2013, the defendant flew to Kansas City from Maryland to provide funds for purported stolen computer equipment to be obtained after June 14, 2013.
- On or about June 25, 2013, the defendant delivered approximately $27,300 cash to the Sprint employee for the purported stolen computer equipment.
- On or about June 28, 2013, the defendant told the Sprint employee that he would travel to Kansas City again to deliver additional funds for the purported stolen computer equipment.
- On or about July 8, 2013, the defendant flew to Kansas City to meet the former Sprint employee and delivered approximately $10,000 for the purported stolen computer equipment.

This was all in violation of Title 18, United States Code, Section 371.

## Factual Support

I am a Special Agent with the Federal Bureau of Investigation (FBI), Kansas City, Missouri. I have been employed as a sworn officer with the FBI since September 1995, and am currently assigned to the Financial Crimes Squad. Prior to my assignment in the Kansas City Division, I was assigned to the Washington Field Division where for four years I investigated computer related crimes, including copyright and trademark infringement, Internet fraud, credit card fraud, and matters relating to child exploitation. For six years during my tenure at the Washington Field Division, I was a supervisor for a cyber squad whose responsibilities included criminal investigations that involved theft of trade secrets, copyright and trademark infringement, Internet fraud investigations, and crimes involving the online sexual exploitation of children. As a Special Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

The facts in this affidavit are derived from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show that there is sufficient probable cause for the charge and does not set forth all of my knowledge about this matter.

In June 2011, Corporate Security for Sprint/Nextel discovered that computer equipment was missing from Sprint's Stic Lab located in Lenexa, Kansas. Sprint's investigation determined that a Sprint employee removed Cisco switches from the Stic Lab on June 7, 2011, without the authority or consent of Sprint. Sprint terminated this employee and referred the matter to the FBI. The former Sprint employee admitted to the thefts and agreed to cooperate with the FBI and operate as a Confidential Human

Source (CHS).

In August 2003, CHS began stealing computer parts from Sprint and posting the parts for sale on eBay, an online auction website. CHS admitted taking the parts from the Sprint warehouse, multiple Stic labs, and via direct shipments of equipment to CHS's cubicle. Through eBay, CHS met an individual who was willing to purchase all such switches and technology equipment.

In late 2005, the person CHS met through eBay introduced CHS to another individual, the Maryland conspirator, also willing to purchase the stolen Cisco switches and technology equipment. By mid 2006, CHS was selling the stolen equipment exclusively to the Maryland conspirator, who flew to Kansas City, Missouri, to meet with CHS in person. In 2007, CHS resigned from Sprint, but returned as an employee of Sprint in the Summer of 2008. Within days of being rehired, CHS started stealing equipment and selling the equipment to the Maryland conspirator.

The FBI's investigation corroborated some of the information provided by CHS. A review of CHS's telephone records revealed that between March 2010 and July 2011, CHS and the Maryland conspirator called and sent text messages to each other on more than 2,100 occasions. Records also revealed numerous electronic mail (e-mail) communications between CHS and the Maryland conspirator from November 2009 through July 2011. The content of the e-mail communications between CHS and the Maryland conspirator included discussions of pricing, shipment, and payment for the stolen computer equipment. Bank records showed CHS received over $2 million from the Maryland conspirator between July 2007 and July 2011.

After CHS was terminated at Sprint during the summer of 2011, the Maryland

conspirator continued to call or send text messages to CHS approximately once per month inquiring whether CHS was selling computer equipment.

In March 2013, at the direction of FBI agents, CHS re-initiated contact with the Maryland conspirator via e-mail, stating CHS was attempting to return to employment with Sprint. CHS asked the Maryland conspirator what type of "gear" to seek to make the most money and move it the fastest. The Maryland conspirator responded that anything "Cisco" would be fine.

On March 14, 2013, CHS received an email from "J. Chukwumah," stating the following:

Hello [CHS],

My name is John, [the Maryland conspirator's] friend. Are you set up in any way to get transfers through your email? There is no US bank in this area and I am stock at work and cannot get to the bank as urgent as [the Maryland conspirator] made it sound.
….will wait for you're your [sic] response.

John

CHS had never heard of the defendant and did not respond to the e-mail.

On March 15, 2013, the Maryland conspirator told CHS that he had wire transferred $250 to CHS via Western Union and provided the tracking number via e-mail. The wire transfer was received by CHS, which was sent by the defendant on March 19, 2013.

In e-mail communications on March 20, 2013, the Maryland conspirator told CHS that he was in Africa trying to set up a data center for two government ministries, so would not return to the United States for six months. On March 27, 2013, through a series of e-mail communications, CHS told the Maryland conspirator it was "good to be

back at Sprint!" CHS asked the Maryland conspirator if there was anything needed for the data centers in Africa. CHS then provided a list of computer equipment to the Maryland conspirator and asked the value of these goods. The next day, the Maryland conspirator provided the amount he would pay for a specific list of switches and offered to send CHS at least $10,000 in advance of the deal. The Maryland conspirator provided a shipping address for his new company to receive the stolen equipment and would also provide a United Parcel Service (UPS) account number to pay for the shipment. The Maryland conspirator directed the stolen equipment be sent to "John Chukwumah/receiving dept, Data Tower, Inc., [on] Fallswood Way in Lorton, Virginia."

In a telephone conversation on April 1, 2013, the Maryland conspirator told CHS that Chukwumah would send CHS $20,000 and bring $50,000 in cash to CHS in Kansas City. The Maryland conspirator wanted CHS to meet Chukwumah, his representative in the United States. CHS told the Maryland conspirator that he/she did not wish to conduct "business" with Chukwumah because CHS had never dealt with the Chukwumah. The Maryland conspirator told CHS that Chukwumah was trustworthy and had been working for the Maryland conspirator's company for one year. The Maryland conspirator told CHS that Chukwumah could meet CHS at the airport and give CHS the cash. CHS said that he/she only wanted to deal directly with the Maryland conspirator and would wait for him to return to the United States.

In a telephone conversation on April 3, 2013, the Maryland conspirator continued to attempt to convince CHS to deal directly with Chukwumah. The Maryland conspirator explained that he set up his business so that someone else could run it while he was working on projects in Africa. The Maryland conspirator told CHS that he

had already found customers to purchase the products on the list CHS provided, but that the customers could not pay the Maryland conspirator until they received the computer equipment.

In a telephone conversation between CHS and the Maryland conspirator on April 8, 2013, after failing to convince CHS to deal solely with Chukwumah, the Maryland conspirator told CHS that he would file paperwork so that he could travel to the United States. The Maryland conspirator said he would bring Chukwumah with him to meet CHS in Kansas City so that CHS could complete all future deals directly with Chukwumah.

On May 20, 2013, CHS e-mailed the Maryland conspirator inquiring what time CHS should pick him up at the airport in Kansas City. The Maryland conspirator responded that he was leaving Africa on Thursday, arriving in Maryland on Friday evening, May 24, 2013. The Maryland conspirator explained that he would need two to three days to collect the money, but he had already pre-sold the computer equipment and could come to Kansas City with the entire amount of $127,000 if CHS pre-shipped the parts to the Maryland conspirator's address on Cedar Spring Street in Gaithersburg, Maryland. The Maryland conspirator also offered that CHS could keep the computer equipment and the Maryland conspirator would send CHS money orders under $5,000 that could be cashed "without being traced" and then bring more cash when the Maryland conspirator met CHS in Kansas City. In a subsequent telephone call, the Maryland conspirator told CHS that he could fly to Kansas City on May 29, and would bring $30,000-$50,000 cash, as well as Chukwumah.

On May 25, 2013, the Maryland conspirator e-mailed CHS to explain his travel

agent purchased a ticket on his behalf for the wrong date, so the travel agent was attempting to get the ticket altered. In the meantime, the Maryland conspirator had directed Chukwumah to gather the money so the Maryland conspirator could fly quickly to Kansas City to meet CHS.

On May 30, 2013, the Maryland conspirator sent an e-mail to CHS, which was copied to Chukwumah, explaining that he was unable to fly to the United States due to a family medical issue. The Maryland conspirator asked CHS to work with Chukwumah on his behalf to complete the transaction for the computer equipment, explaining Chukwumah would fly to Kansas City to meet CHS and pay for the goods. CHS responded to the Maryland conspirator's e-mail, copying Chukwumah, agreeing to conduct the transaction with Chukwumah. CHS addressed Chukwumah in the e-mail stating: "John, send me your number and I'll give you a call. Please forgive me, but we both have a lot to risk here and need to trust each other...I need to make sure you understand what you're doing. This is a lot of money for me to trust someone with that I've never meet [sic] before."

On May 31, 2013, Chukwumah sent an e-mail to CHS, copying the Maryland conspirator, stating that he understood CHS's skepticism doing business with new people. Chukwumah explained that he had been "doing this for a while now and pride myself in doing business the best way it can be done." Chukwumah stated he has known about CHS for years through the Maryland conspirator and was aware CHS was a significant supplier for the Maryland conspirator.

CHS and the Maryland conspirator agreed that a total of $15,000 would be wire transferred to CHS's bank account in three transactions of $5,000 to avoid bank

reporting requirements, and Chukwumah would bring $30,000-$50,000 cash to Kansas City. On June 4, 2013, the defendant wire transferred $5,000 from his bank account to CHS's bank account. On June 11, 2013, Chukwumah wire transferred $5,000 from his bank account to CHS's bank account, and also completed a counter deposit of $750 into CHS's bank account.

    In a telephone call on June 4, 2013, Chukwumah told CHS that he had been working with the Maryland conspirator for four years and has been in the background between CHS and the Maryland conspirator. Chukwumah explained that more than half of the items on the list of computer equipment provided by CHS had been sold, with most to one client. CHS explained the items had "Sprint all over it," so CHS does not want it coming back to CHS, which was why CHS liked knowing in previous transactions of similar computer equipment with the Maryland conspirator that it was sent to Africa, lessening the likelihood that the equipment could be traced to CHS. CHS also asked Chukwumah if he was able to change the configurations on the equipment because it was currently set up with Sprint configurations. CHS asked Chukwumah to remove the Sprint stickers from the computer equipment so that "it does not come back to me." Chukwumah explained he was a network engineer, so it would not be a problem to change the configurations on the computer equipment and he agreed to remove the Sprint identification stickers. Chukwumah added that he had changed configurations on similar computer equipment for the Maryland conspirator in the past.

    Chukwumah said he would bring $25,000 cash when he meets CHS in Kansas City, and would let CHS know when he was flying because CHS needed time to remove

the computer equipment from the Sprint lab, which CHS explained would need to be removed before an inventory count.

On June 14, 2013, Chukwumah arrived in Kansas City to meet CHS and take possession of the purported stolen computer equipment. Chukwumah brought $20,000 in cashier's checks to pay CHS for the purported stolen goods. Chukwumah and CHS drove to a UPS store in Kansas City, Kansas, where Chukwumah prepared shipping labels so the purported stolen goods could be sent to an address in New Jersey. Chukwumah told CHS that he was shipping these goods to another individual in New Jersey, who was sending a vehicle and this stolen computer equipment to Africa in a shipping container. During a telephone conversation with the Maryland conspirator on the drive to the UPS store, CHS was asked to obtain more stolen computer equipment and then ship it to Chukwumah's residence in Virginia.

In a telephone call on June 18, 2013, the Maryland conspirator told CHS that he was sending the defendant to Kansas City to deliver $30,000-$40,000 cash to CHS the following week for additional purported stolen computer equipment. In email communications the same day, the Maryland conspirator provided prices for a list of known Cisco part numbers, which was referenced as "the second deal." In email communications on June 21, 2013, CHS agreed to provide these purported stolen computer equipment to the Maryland conspirator for $34,000.

On June 23, 2013, through text message communications, the Maryland conspirator told CHS that the defendant would fly to Kansas City the next evening and bring the cash. The Maryland conspirator also told CHS that he could send three to four wire transfers of $5,000 each. The Maryland conspirator asked CHS if all of the

items on the "first deal" had been shipped and asked when the items on the "second deal" would be shipped. CHS responded that the "first deal" had been shipped and that CHS would start taking the "gear" out of the lab for the "second deal."

On June 24, 2013, through text message communications, the Maryland conspirator told CHS that the defendant was able to withdraw $27,000 cash to deliver to CHS. The Maryland conspirator asked if CHS was able to "get them out of the lab today," referring to the items on the "second deal." CHS explained it was difficult because some engineers were present in the lab. Later that day, CHS received a telephone call from the defendant advising that his connection through Charlotte from the Baltimore airport had been cancelled, so the defendant changed his flight to the following morning. The defendant explained he wanted CHS to take him to a Wells Fargo bank so that he could withdraw additional funds to pay CHS.

On June 25, 2013, the defendant arrived in Kansas City to meet CHS and provide a cash payment. CHS and the defendant drove to a Wells Fargo bank in Shawnee, Kansas, so the defendant could withdraw additional funds. When the defendant attempted to withdraw the funds, he was told by Wells Fargo that a hold had been placed on the account, preventing the defendant from making an additional withdrawal. During the drive to and from the airport, the defendant told CHS that he had the same type of business as the Maryland conspirator. The defendant explained there was a 40-foot container in a warehouse in New Jersey being used to ship the purported stolen computer equipment to the Maryland conspirator in Africa. The defendant explained the Cisco equipment was placed in the front of the container and two or three cars were parked in the rear of the container to mask the presence of the

computer equipment.

During the conversation with the defendant, CHS told him that the computer equipment was stolen, and the defendant did not appear surprised when that was mentioned. CHS told the defendant that CHS had to wait until there was no one around the Sprint lab to remove the equipment. The defendant explained that he was partnering with the Maryland conspirator on the "second deal" and would wire money for part of the "first deal." Prior to being dropped off at the airport, the defendant told CHS that he had traveled with $27,400 cash that he had withdrawn from a Bank of America in Maryland. The defendant kept $100 and provided the remainder to CHS. The defendant asked CHS when CHS was going to start shipping the equipment, and CHS responded the removal of equipment from the lab would commence the following day. The defendant told CHS to provide him with the tracking numbers as soon as CHS shipped the equipment to New Jersey.

On June 27, 2013, CHS sent an email to the Maryland conspirator, which was copied to the defendant, asking the Maryland conspirator to provide a price check on an additional list of parts known to be Cisco part numbers. The Maryland conspirator responded by providing prices for what is referenced as "the third deal," which totaled $16,000. In a telephone call on June 27, 2013, the defendant told CHS to ship out whatever CHS had on the "second deal" and that CHS did not need to wait until the entire list was acquired prior to shipment. CHS explained to the defendant that CHS was balancing a lot of things and it was difficult keeping track of all three deals. CHS told the defendant that Sprint has inventory controls and that when CHS steals the equipment, CHS must make sure it will not show as missing in inventory. The

defendant acknowledged what CHS said, and suggested that CHS become more organized.

On July 1, 2013, the Maryland conspirator sent CHS an email, which was copied to the defendant, stating the defendant would arrive in Kansas City on July 3, 2013, bringing CHS $30,000-$40,000 in cash and cashier's checks.

On July 8, 2013, the defendant flew to Kansas City to meet CHS. Prior to his arrival, CHS sent the defendant a text message in which he told the defendant to meet with "Mark," who was actually an undercover FBI agent. CHS told the defendant that "Mark" had been helping him steal from Sprint for ten years. After arriving at the airport, the defendant traveled with "Mark" to a Sprint facility in Lenexa, where the defendant was arrested. On the defendant's person was a cashier's check in the amount of $8,000 and US currency in the amount of $4,716.

I respectfully request the issuance of an arrest warrant for the defendant based on the information above.

Melissa S. Morrow
Special Agent, FBI

Sworn to before me and subscribed in my presence this 8th day of July, 2013, at Kansas City, Kansas.

HONORABLE JAMES P. O'HARA
UNITED STATES MAGISTRATE JUDGE
District of Kansas

15

Penalties:

    Ct. 1:  NMT 5 years imprisonment; NMT $250,000 fine; NMT 3 years supervised release; $100 special assessment